IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| DARIAN BALCOM, | ) | |
| | ) | |
| Plaintiff, | ) | 2:19-CV-00506-DSC |
| | ) | |
| vs. | ) | |
| | ) | |
| GABE FIGUEROA AND JORGE ZARATE, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

Cynthia Reed Eddy, Chief United States Magistrate Judge.

## I.    RECOMMENDATION

This civil action was initiated by Plaintiff Darian Balcom alleging that Defendants two City of Pittsburgh Police Officers Gabe Figueroa and Jorge Zarate ("Defendants" or "Defendant Officers") violated Plaintiff's civil rights in connection with criminal charges brought against her in Allegheny County, Pennsylvania which were dismissed at the preliminary stages. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331.

Presently before the Court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 by Defendants. (ECF No. 53). For the reasons that follow, it is respectfully recommended that the motion for summary judgment be granted in part, denied in part and held in abeyance in part. It is specifically recommended that Defendant Officers' motion be granted with respect to Plaintiff's Fourth Amendment False Arrest/Malicious Prosecution Claims and denied with respect to Plaintiff's First Amendment Retaliation and Fourteenth Amendment Equal Protection claims and held in abeyance with respect to whether Plaintiff's First Amendment right against retaliation was clearly established at the time of her arrest in 2017.

## II.      REPORT

### a.  <u>Background</u>

Plaintiff owns and manages rental properties in the City of Pittsburgh, including a two-unit residence located at 3542 Fleming Avenue in the Brighton Heights neighborhood of the City of Pittsburgh, Pennsylvania. Pl's Statement of Facts ("SMF") (ECF No. 63) at ¶ 1.  Plaintiff's friend, Matthew Grebner helped Plaintiff with maintenance and other property management responsibilities but was not employed by Plaintiff. *Id*. at ¶ 4.  Plaintiff and Mr. Grebner helped the owners of a neighboring property, 3538 Fleming Avenue, with property management responsibilities. *Id*. at ¶ 8.

In December 2017, Plaintiff became aware that Laken Snyder was squatting in the second-floor unit of 3538 Fleming Avenue. *Id*. at ¶ 9.  Ms. Laken was the ex-girlfriend of a former tenant in the unit. *Id*.  Early in the morning of December 18, 2017, Jimmy Gitzen, one of the owners of 3538 Fleming Avenue, told Plaintiff that he believed Snyder had abandoned the unit leaving dogs behind.  Mr. Gitzen lived on the first floor of 3538 Fleming Avenue and told Plaintiff that he had been hearing the dogs scratching at the floor for long periods of time. *Id*. at ¶ 10.  At Mr. Gitzen's request, Plaintiff called Animal Control and reported the situation as possibly abandoned dogs and Animal Control responded immediately by visiting the property and left a door hanger instructing the dogs' owner to contact them. *Id*. at ¶ 11.  That same day, Plaintiff accompanied Mr. Gitzen into the building's second floor unit to inspect the unit and to give food and water to the dogs. *Id*. at ¶ 12.  Plaintiff observed that the apartment was filthy and did not look livable or inhabited, animal feces and garbage was strewn everywhere, there was overturned furniture, graffiti on the walls, a clogged toilet, bathtub full of dirty water, no sheets on the bed and there was no food or water for the dogs. *Id*.  Plaintiff took photographs of the apartment's condition. *Id*.  Plaintiff and

Mr. Gitzen found two dogs inside and fed one of the cans of dog food and left water for them and found a cat litterbox that was filled with feces that a cat would not be able to use it, but they did not see any cats in the apartment. *Id*. at ¶ 13.

Mr. Gitzen and Plaintiff agreed that Plaintiff would return to the apartment in the evening when Mr. Gitzen was at work and would feed the dogs again and Mr. Gitzen left a can of dog food on the steps by the apartment. *Id*. at ¶ 14.  Mr. Grebner became aware of the situation and offered to accompany Plaintiff to feed the dogs. *Id*. at ¶ 15.  When Plaintiff and Mr. Grebner arrived at the apartment, two cats appeared, and they appeared to be very hungry. *Id*. at ¶ 16.  Because of the conditions of the apartment and Mr. Grebner's belief that Animal Control would euthanize the cats, Plaintiff and Mr. Grebner took the cats to an empty unit in Plaintiff's apartment building next door where they could provide them with food, water, and a clean litterbox. *Id*. at ¶ 17.

Talman Charters, one of Balcom's tenants in her property across the street from Mr. Gitzen's property, saw people in the abandoned apartment and called 911. *Id*. at ¶ 19.  He reported two individuals with flashlights in the upstairs residential unit of 3538 Fleming Avenue. Defs' Statement of Fact ("SMF") (ECF No. 55) at ¶ 1.  Mr. Charters reported that he knew the resident of the apartment and that the resident was not home at that time. *Id*. at ¶ 2.  Defendant Officers Figueroa and Zarate were dispatched to the address to respond to the 911 call and were told that there was a burglary in process. *Id*. at ¶¶ 3-4.  When the Defendant Officers arrived on the scene, they were met by Mr. Charters who told the Defendant Officers that his landlord, Plaintiff Balcom and Mr. Grebner had walked out of 3538 Fleming Avenue carrying two crates that he believed contained cats and that he believed Plaintiff and Mr. Grebner were in the upstairs unit of 3542 Fleming Avenue. *Id*. at ¶¶ 8-9.  Mr. Charters informed Officers that Ms. Laken informed him that no one should be in the apartment. Pl's SMF at ¶ 25.  Mr. Charters let Defendant Officers in the

common hallway of 3542 Fleming Avenue and Defendant Officers went upstairs to the upper unit where Plaintiff and Mr. Grebner met them at the door. Def's SMF at ¶¶ 12-13.  Plaintiff maintains that the Officers entered without consent and without a warrant. Pl's SMF at ¶ 21.

Defendant Officers asked Plaintiff if she had taken anything from the building next door and she responded that he had taken two cats. Def's SMF at ¶ 14.  Defendant Officer Figueroa asked Plaintiff Balcom whether she was allowed inside the next-door apartment and she responded "I didn't need [Ms. Snyder's] permission." *Id.* at ¶ 15; Pl's SMF at ¶ 23.  Plaintiff maintains that she did not tell the Officers that she did not need permission to enter the unit. Pl's SMF at ¶ 23.

Defendant Officers then took Plaintiff and Mr. Grebner outside and separated them. *Id.* at ¶ 17.  Outside of Plaintiff's presence, an unnamed police officer asked Mr. Grebner whether he thought he and Plaintiff were authorized to be in the upstairs unit of 3538 Fleming Avenue. *Id.* at ¶ 18. He responded that he "didn't really know what was going on," and when asked to clarify, Mr. Grebner added "I had no reason to believe we were not authorized." *Id.*  Officer Figueroa does not recall having spoken to Mr. Grebner. *Id.* at ¶ 19.  Two other City of Pittsburgh Police Officers who arrived on the scene, Officers Smith and Donnelly reported interacting with Mr. Grebner outside. *Id.* at ¶ 20.  Officer Donnelly described Mr. Grebner as "shocked" that there had been a report of a burglary because he believed that he and Plaintiff had permission to enter the upstairs apartment at 3538 Fleming Avenue. *Id.* at ¶ 21.

When Plaintiff was taken outside and questioned, Defendant Officers maintain that she became upset and "irate" and Officer Figueroa called Plaintiff "sweetheart" to calm her down. *Id.* at ¶¶ 22-23.  According to Plaintiff, the Officers were not properly investigating the situation and she said to Officer Figueroa to "get off your power trip." Pl's SMF at ¶ 27.  Thereafter, Officer Figueroa made a statement to Plaintiff in which he called her "sweetheart."  Plaintiff told Officer

Figueroa, "Don't call me sweetheart" and Officer Figueroa said to Plaintiff, "You probably don't like Trump." Plaintiff responded: "No, I don't." Officer Figueroa responded by saying either "I'm glad he won," or "I'm glad he was elected." Pl's SMF at ¶¶28-30. Plaintiff then asked the Officers if their behavior and handling of the situation was consistent with their training and the Officers laughed at her. *Id*. at ¶ 31.

Plaintiff testified that she was calm and cooperative with the police that evening. *Id*. at 28. According to the Officers at the scene, in response to being called "sweetheart," Plaintiff became angry and began yelling at Officer Figueroa and comparing the Officers to Donald Trump, called them "wife-beaters" and used profanities. Def's SMF at ¶¶ 25-27. Officer Figueroa testified that he responded to her comment by saying to Plaintiff, "okay, it's time to go to jail now." Pl's SMF at ¶ 32.

While the Officers were outside with Plaintiff and Mr. Grebner, Laken Snyder, the resident of the upstairs unit of 3538 Fleming Avenue arrived and Officers asked Ms. Snyder if she had given Plaintiff permission to enter her home or take her cats out of the apartment and Ms. Snyder confirmed the two cats were hers and told the Officers she had not given anyone permission to enter her apartment. Def's SMF at ¶¶ 30-31.

Thereafter, Officers Figueroa and Zarate charged Plaintiff with felony burglary, felony criminal trespass and misdemeanor theft by unlawful taking. *Id*. at ¶ 32. The Defendant Officers did not arrest Mr. Grebner because they allege he did not make incriminating statements and the Officers believed he was under the impression from Plaintiff that they had permission to enter Ms. Snyder's apartment. *Id*. at ¶ 34. According to Plaintiff, Officer Figueroa told Mr. Grebner that Plaintiff did not do anything wrong, but that she had "sassed" the officers and "you can't do that to a police officer." Pl's SMF at ¶ 37. Plaintiff also maintains that Officer Figueroa also referred

to Plaintiff as a "bleeding-heart liberal" during his interaction with Mr. Grebner. *Id*.

Plaintiff was placed into Defendant Officers' patrol car and taken to the Allegheny County Jail and was released on her own recognizance the next morning. *Id*. at ¶¶ 35-36.  The charges against Plaintiff were thereafter withdrawn. *Id*. at ¶ 37.

Plaintiff maintains that she is not a supporter of former United States President Donald Trump and has openly opposed him, his policies and his presidency. Pl's SMF at ¶ 2.  Officer Figueroa supported former President Trump and drove a vehicle with a "TRUMP" bumper sticker from 2016 until sometime in 2018. *Id*. at ¶¶ 5-6.

Three claims remain against the Defendant Officers – (1) a First Amendment retaliation claim under 42 U.S.C. § 1983; (2) a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983; and (3) a Fourth Amendment false arrest and/or malicious prosecution claim under 42 U.S.C. § 1983.  Defendant Officers seek summary judgment in their favor on all remaining claims.

      b.  <u>Standard of Review</u>

The standard for assessing a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is well settled. A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor on that issue. *Id.*  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citing *Huston*, 568 F.3d at 104).

A plaintiff may not, however, rely only on his complaint to defeat a summary judgment motion. *See, e.g.*, *Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."). Allegations made with no evidentiary support may be disregarded. *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

  c. <u>Discussion</u>

    i. *Fourth Amendment False Arrest/Malicious Prosecution Claims*

Defendants Officers argue that they are entitled to summary judgment on Plaintiff's Fourth

Amendment false arrest/malicious prosecution claims because there was probable cause to arrest and prosecute Plaintiff.  In response, Plaintiff indicates that she "offered to voluntarily dismiss her Fourth Amendment claims to avoid the time and expense involved in the summary judgment process." (ECF No. 61 at 1 n. 1).[1]  Plaintiff does not substantively respond to Defendants' argument regarding her Fourth Amendment claims.

Accordingly, it is respectfully recommended that Defendant Officers' motion for summary judgment as to Plaintiff's Fourth Amendment false arrest/malicious prosecution claims be granted as unopposed.

### ii.   First Amendment Retaliation

Plaintiff asserts that the Defendant Officers retaliated against her in violation of the First Amendment after she complained of the Officers' conduct and responded that she did not support former President Trump and Defendant Officers arrested her and not Mr. Grebner who did not make such statements for entering the apartment and removing the cats.

The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006).  To state a claim for First Amendment retaliation, plaintiffs must show that they (1) engaged in protected speech or activity; (2) the government responded to that speech or activity with retaliation; and (3) that the protected speech or activity was the cause of the government's retaliation. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019).

Where plaintiffs allege they are arrested in retaliation for engaging in protected speech, there is generally no causation where there is probable cause to effect the arrest. See *Id.* at 1727.

---

[1]      Plaintiff did not file any notice of voluntary dismissal of these claims prior to Defendants filing their motion for summary judgment.

However, the United States Supreme Court has explained there is a narrow exception to the probable cause defense for retaliation "when a plaintiff presents objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727. The Supreme Court explained that the no-probable cause requirement does not apply "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.' " *Nieves*, 139 S. Ct. at 1727 (quoting *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 201 L. Ed. 2d 342 (2018)). The Supreme Court provided an anecdote explaining a situation where the plaintiff's proffered objective evidence could defeat the no-probable-cause requirement. It explained that in the present day, law enforcement officers have broad authority to make warrantless arrests of citizens when there is probable cause for even minor criminal offenses, such as jaywalking but rarely use their authority to arrest a jaywalker. It provided the example that "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Nieves*, 139 S. Ct. at 1727. The Supreme Court reasoned that in this example, "because probable cause does little to prove or disprove the causal connection between animus and injury[,]" the no-probable-cause requirement should not apply. *Nieves*, 139 S. Ct. at 1727.

Defendant Officers first argue that the *Nieves* exception does not apply because it is limited to situations where officers make arrests for minor offenses and because the crimes Plaintiff was arrested for were not minor, *Nieves* does not apply. Defendant Officers focus on the jaywalking

anecdote and argue that because "Plaintiff's arrest was neither jaywalking nor a misdemeanor[,]" the *Nieves* exception does not apply. (ECF No. 54 at 12). Defendant Officers offer no citation to legal authority to support the proposition that the *Nieves* exception can only be applied in the context of arrests for minor offenses. *See contra Thomas v. Cassia Cty.*, 491 F. Supp. 3d 805, 812 (D. Idaho 2020) (considering *Nieves* in the context of a hit-and-run scenario but finding that plaintiff proffered no objective evidence that it was rare for hit-and-run suspects to be arrested). To the contrary, Justice Thomas's dissenting opinion in *Nieves* implies that though the majority provides the example related to "warrantless misdemeanor arrests," the "exception apparently applies to all offenses, including serious felonies[.]" *Nieves*, 139 S. Ct. at 1729 (Thomas, J., dissenting).

While Defendant Officer's argument is well-taken, it demands a narrow interpretation of *Nieves* that does not allow for a complete application of its holding. While Justice Roberts gave the example of a jaywalker being arrested, to use that anecdote to only apply the "no probable cause" exception for retaliatory arrests involving minor offenses would ignore the Supreme Court's explicit finding that "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves,* 139 S.Ct. at 1727. In other words, the grading of the offense can be a consideration in determining whether objective evidence exists, but to limit Nieves to apply only to minor offenses where there is otherwise objective evidence of disparate treatment between similarly situated individuals not engaged in the same sort of protected speech would impermissibly narrow its explicit finding. The jaywalking anecdote was just an example of how a plaintiff can show objective evidence of disparate treatment of similarly situated individuals not engaged in protected speech and the Supreme Court did not

explicitly require that for *Nieves* to apply that the plaintiff only be charged with a minor offense. To this point, in Justice Sotomayor's dissenting opinion, she characterizes the majority's opinion promulgating the "objective evidence," "otherwise similarly situated" and "the same sort of protected speech" standards as unclear, but encourages courts "to approach this new standard commonsensically." *Nieves*, 139 S. Ct. at 1741 (Sotomayor, J., dissenting); *see accord Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part, dissenting in part). As further explained by the Court of Appeals for the Seventh Circuit, "[w]e cannot, however, predict in advanced every factual scenario which might meet the Court's 'objective evidence standard [under *Nieves*]. We must consider each set of facts as it comes to us, and in assessing whether the facts supply objective proof of retaliatory treatment, we surmise that . . . common sense must prevail." *Lund v. City of Rockford, Illinois*, 956 F.3d 938, 945 (7th Cir. 2020) (citing *Nieves*, 139 S. Ct. at 1734-41 (Gorsuch, J. concurring and dissenting; Sotomayor, J., dissenting). Therefore, the undersigned finds that it is not a requirement for Plaintiff to show that she was arrested for a minor offense for the *Nieves* exception to apply. A commonsense approach dictates that the court conduct an analysis to determine whether the record contains any objective evidence that she was arrested when otherwise similarly situated individuals, including Mr. Grebner, not engaged in the same sort of protected speech had not been, and not end the analysis at whether she was arrested for a low-grade offense.[2]

Next, Defendant Officers argue that *Nieves* does not apply because there is no evidence that Plaintiff and Mr. Grebner are similarly situated. (ECF No. 54 at 12). They argue that Mr. "Grebner provided no statements that he didn't(sic) need permission to enter Ms. Snyder's

---

[2]  To be clear, Defendants do not argue that there is a lack of objective evidence of disparate treatment and only argue that *Nieves* only applies to minor offenses. Therefore, no recommendation as to the "objective evidence" standard will be made.

apartment, and when asked, he responded that 'he had no reason to believe we were not authorized.'  Officer Figueroa suspected that [Mr.] Grebner was the other individual who entered the apartment and removed the cats, but he did not have the same degree of certainty about [Mr.] Grebner's knowledge and criminal intent that he had about Plaintiff's[] and could not have established probable cause based on the information he gathered." (ECF No. 54 at 13-14).

While there is a dearth of binding legal precedent on what constitutes a "similarly situated" individual in the context of a First Amendment retaliatory arrest case, likening this standard to claims under the Equal Protection Clause, persons are "similarly situated" when "they are alike in all relevant aspects." *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 203 (3d Cir. 2008). Generally, the questions of whether a plaintiff was treated differently from others similarly situated is "a fact question for the jury, but summary judgment is appropriate where it is clear that no reasonable jury could find the similarly situated prong met." *New Castle Cty. v. Wilmington Hosp., LLC*, 963 A.2d 738, 743 (Del. 2008); *see also Young v. Twp. of Coolbaugh*, 276 F. App'x 206 (3d Cir. 2008) (finding summary judgment was properly entered where plaintiff failed to produce any evidence that he was similarly situated to others that were treated differently). Under *Nieves*, this inquiry should remain objective and "the statements and motivations of the particular arresting officer are 'irrelevant' at this stage." *Nieves*, 139 S. Ct. at 1727 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) and *Lozman*, 138 S. Ct. at 1952–1953).[3]  Moreover, the Court is compelled to view the facts in the light most favorable to

---

[3]     As pointed out by Justice Sotomayor, this "objectivity" standard can in practice be problematic because often times, an officer's own statements or direct admissions "may often be the best available evidence of unconstitutional motive[]" in a First Amendment retaliatory arrest claim. *Nieves*, 139 S. Ct. at 1739.  Justice Sotomayor posits that "[a]s a result [of applying an objective inquiry], the Court's standard in some cases will have the strange effect of requiring courts to blind themselves to smoking-gun evidence while simultaneously insisting upon an inferential sort of proof that, though potentially powerful, can be prohibitively difficult to obtain."

Plaintiff in making this determination.

A reasonable jury could find that Plaintiff and Mr. Grebner were alike in all relevant aspects:  they both entered the apartment and participated in removing the cats; they both admitted to Defendant Officers that they entered the apartment and participated in removing the cats from the apartment; and Ms. Snyder indicated that she did not give permission to Mr. Grebner or Plaintiff to enter the apartment.  Plaintiff was arrested and charged with felony burglary, felony criminal trespass and misdemeanor theft by unlawful taking, whereas Mr. Grebner was not criminally charged. While Defendant Officers seek to draw a distinction between Plaintiff and Mr. Grebner's responses to Officers questions regarding whether they had permission to enter the apartment when Mr. Grebner responded he "had no reason to believe we were not authorized" versus Plaintiff's statement that she "did not need [Ms. Snyder's] permission" to enter, what effect these statements had on Defendant Officers' decision to arrest only Plaintiff for entering the apartment and removing the cats is a question of fact for the jury to decide.

Lastly, Defendant Officers also passingly argue that their conduct could not have been retaliation for Plaintiff's speech because they had probable cause to arrest her prior to her protected speech. (ECF No. 54 at 9-10).  Defendant Officers cite to no legal authority for this proposition, and as pointed out by Plaintiff, "the fact that they could have arrested her before she engaged in

_____

*Nieves*, 139 S. Ct. at 1739 (Sotomayor, J., dissenting).  In this case, while it seems to be the holding of *Nieves* that the Court may not consider, for example, Officer Figueroa's statements regarding his political beliefs and that Plaintiff was being arrested because she "sassed" the Officers in determining whether objective evidence exists, this case seems to fit squarely within Justice Sotomayor's example of requiring a court to ignore smoking gun evidence regarding an officer's own statements.  That said, the Court need not consider the Officer's statements because the facts underlying this case are the rare example of when two individuals are engaged in identical conduct, one engages in protected speech, and the other does not, and the person who engaged in protected speech is arrested in retaliation for that speech.  Therefore, the court need not consider the Officers' motivations through their own conduct to find that a reasonable jury could conclude that Plaintiff was retaliated against for her speech.

protected speech but did not decide to do so until after she engaged in protected speech, would seem to support her claims that the arrest was retaliatory." (ECF No. 61 at 9) (emphasis omitted).

Accordingly, it is respectfully recommended that Defendant Officers' motion for summary judgment for Plaintiff's First Amendment retaliation claim be denied.

### iii.   Equal Protection

Plaintiff claims that her equal protection rights under the Fourteenth Amendment were violated because the Defendants selectively enforced facially neutral laws when they arrested and charged her and not Mr. Grebner in connection with entering the apartment and removing the cats. Defendants argue that they are entitled to summary judgment on Plaintiff's Equal Protection claim because she was not treated differently because of her gender and because Mr. Grebner is an improper comparator.

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' " *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (quoting U.S. Const. amend. XIV, § 1.).   In essence, the Equal Protection Clause guarantees that persons similarly situated be treated alike. *Id.* (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)).   In practice and as applied here, the Equal Protection Clause proscribes the discriminatory enforcement of facially valid laws. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).   A plaintiff must demonstrate the following to state a selective-enforcement claim: (1) defendants treated her differently from other similarly situated individuals; and (2) defendants' selective treatment was based on an unjustifiable standard, like race, religion or some other arbitrary factor, or to prevent the exercise of a fundamental right. *Dique v. New Jersey State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (quoting *Hill*, 411 F.3d at 125) (quotation

marks omitted).   To prove sex/gender discrimination under the Equal Protection Clause, "a plaintiff must show that any disparate treatment was based upon [her] gender." *Shuman ex rel. Shertzer*, 422 F.3d at 151 (citations omitted).  Persons are "similarly situated" when "they are alike in all relevant aspects." *Startzell*, 533 F.3d at 203. Generally, the questions of whether a plaintiff was treated differently from others similarly situated is "a fact question for the jury, but summary judgment is appropriate where it is clear that no reasonable jury could find the similarly situated prong met." *New Castle County*, 963 A.2d at 743.

Addressing Defendants' argument that Mr. Grebner is not a proper comparator to Plaintiff, this argument is rejected for the same reasons as rejected *supra*. A reasonable jury could find that Plaintiff and Mr. Grebner were alike in all relevant aspects: they both entered the apartment and participated in removing the cats; they both admitted to Defendant Officers that they entered the apartment and participated in removing the cats from the apartment; and Ms. Snyder indicated that she did not give permission to Mr. Grebner or Plaintiff to enter the apartment.  Plaintiff was arrested and charged with felony burglary, felony criminal trespass and misdemeanor theft by unlawful taking, whereas Mr. Grebner was not criminally charged. While Defendant Officers again seek to draw a distinction between Plaintiff and Mr. Grebner's responses to Officers questions regarding whether they had permission to enter the apartment when Mr. Grebner responded he "had no reason to believe we were not authorized" versus Plaintiff's statement that she "did not need [Ms. Snyder's] permission" to enter, what effect these statements had on Defendant Officers' decision to arrest only Plaintiff for entering the apartment and removing the cats is a question of fact for the jury to decide.

As to Defendants' argument that Plaintiff has offered no evidence that she was treated differently because of her gender/sex, they argue that they had probable cause to arrest Plaintiff.

Defendants offer no citation to legal authority for the proposition that the existence of probable cause negates a selective enforcement equal protection claim. The opposite appears to be true. An "equal protection inquiry is distinct from the 'probable cause' inquiry, and the presence of "probable cause" does not mean an officer acted without discriminatory intent[.]" *Christopher v. Nestlerode*, 240 F. App'x 481, 489 (3d Cir. 2007)(unpublished) (affirming district court's explanatory jury instruction on this issue) (citations omitted). As such, Defendants' argument is rejected.

Defendants further argue that while they do not dispute that Officer Figueroa called Plaintiff "sweetheart," he "did not intend offense or was not mindful that the term can be disparaging and sexist[,] . . . section 1983 does not provide a private citizen a remedy for offensive or sexist language that stands on its own, unconnected with the greater set of facts[,]" and there is no evidence that Defendant Officers "arrested Plaintiff and not [Mr.] Grebner because of hostility or discriminatory animus toward women." (ECF No. 54 at 16). Defendant Officer Figueroa's intentions behind calling Plaintiff's "sweetheart" is an issue of fact for the jury to decide. *New Castle County*, 963 A.2d at 743. Likewise, the court must consider all the evidence in the light most favorable to Plaintiff at this juncture and it is reasonable for a jury to infer that Defendant Officers treated Plaintiff differently from Mr. Grebner by calling Plaintiff "sweetheart," which used in this context could be implied as a dismissive and misogynistic term used to describe women or girls, and by telling Mr. Grebner that he was going to arrest Plaintiff, not because she did anything wrong, but because she "sassed" the Officers and "you can't do that to a police officer." Grebner Dec. (ECF No. 64-4) at ¶ 13. It can be reasonably inferred that "sass" used in this context could be implied as a derogatory term used to describe insubordinate or non-subservient behavior by women or girls. Further, Officer Figueroa told Mr. Grebner that he wanted to let him go, but

his answer was not good enough, which could be construed as coaching Mr. Grebner to answer his question in a way to support not charging Mr. Grebner for the same conduct he and Plaintiff were engaged in, whereas Plaintiff was not "coached" to give the correct answer. *Id*. at ¶ 12.  These facts are sufficient to allow a reasonable jury to conclude that Plaintiff was treated differently than Mr. Grebner based on her sex/gender and it is respectfully recommended that Defendants' motion for summary judgment on this basis be denied.

### iv.   Qualified Immunity

Lastly, Defendants argue they are entitled to qualified immunity for Plaintiff's claims. They argue the following: "The question for this review is whether [Defendant Officers] would have known that calling someone "sweetheart" or making statements such as "You probably don't like Trump, do you? I'm glad he won[]" after probable cause had been established to effectuate an arrest would be unconstitutional." (ECF No. 54 at 17).  They further argue that Plaintiffs have the burden of showing her rights were clearly established (ECF No. 54 at 18).

Qualified immunity shields government employees sued in their personal capacities from liability unless their conduct violates "clearly established statutory or constitutional rights . . . which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  In determining whether a government official is entitled to qualified immunity, courts apply a two-part test: (1) whether the facts alleged by the plaintiff establish a violation of a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation such that a reasonable official would understand what he is doing violates that right. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  The court can begin with either prong. *James v. New Jersey State Police*, 957 F.3d 165 (3d Cir. 2020)

The second prong "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, ─, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (internal quotation marks and citations omitted).  This "inquiry is an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant.' " *James*, 957 F.3d 165 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "[T]he plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

Defendants' argument that a constitutional violation is clearly established only if there is a case in which a law enforcement officer calls someone "sweetheart," or makes statements that they "don't like Trump" and "I'm glad he won" impermissibly forces the court to make a qualified immunity analysis in a vacuum.  In determining whether a right is clearly established, the "inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Pearson*, 555 U.S. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (internal quotation marks omitted)).  "Stated another way, a court need not find that the very action in question has previously been held unlawful, . . . but rather may conclude that the firmly settled state of law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 639 (3d Cir. 2015) (internal citations and quotation marks omitted).  The allegedly unconstitutional action here is not simply the words spoken by Defendant Officer Figueroa, it is whether Plaintiff at the time of her arrest in 2017 had clearly established constitutional rights to

not be retaliated for engaging in protected activity under the First Amendment and for not being discriminated against based on gender in violation of the Fourteenth Amendment Equal Protection Clause.

As for Plaintiff's Equal Protection claim, her right to be free from discriminatory enforcement of facially valid laws where both she and her male comparator engaged in identical conduct but officers used their authority to only arrest the female-plaintiff because she backtalked the officers, there is no ambiguity in the law that selective enforcement of a law leading to arrest based on a person's gender or sex is a violation of the Equal Protection Clause and was clearly established in 2017 at the time of Plaintiff's arrest and prosecution. *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985) ("Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints.") (quoting *United States v. Batchelder*, 442 U.S. 114, 125, 99 S. Ct. 2198, 2205, 60 L. Ed. 2d 755 (1979)); *Davis v. Passman*, 442 U.S. 228, 235, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979) ("The equal protection component of the Due Process Clause thus confers . . . a federal constitutional right to be free from gender discrimination[.]"); *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 7 L. Ed. 2d 446 (1962) (selective enforcement "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[,]" violates the Fourteenth Amendment Equal Protection Clause). Any reasonable law enforcement officer would have known that conduct violating these rights is unlawful and therefore Defendants are not entitled to qualified immunity on Plaintiff's equal protection claim.

As for Plaintiff's First Amendment retaliation claim, Plaintiff relies upon this Court's adopted report and recommendation for the proposition that the court previously held that Plaintiff had asserted clearly established a First Amendment violation. *See* Rep. and Rec. (ECF No. 30 at

13).  While the Court held for the purposes of the motion to dismiss that Plaintiff's right was clearly established, this determination was made without the benefit of a completed record or without the parties' challenging that the right was clearly established.  The burden rests with Plaintiff to identify case law that establishes that Defendants' conduct violated some clearly established statutory or constitutional right and she cites to no case law or provides any further argument regarding whether her right to be free from police retaliation, regardless of probable cause, was clearly established in 2017 at the time of her arrest.[4] (ECF No. 61 at 15).  Likewise, Defendants have offered no light on this issue.  Because this issue is not fully briefed, it is respectfully recommended that Defendants' motion for summary judgment be partially held in abeyance and referred back to the undersigned to schedule supplemental briefing.

d.  Conclusion

Based on the foregoing, it is respectfully recommended that Defendants' motion for summary judgment be granted in part, denied in part, and held in abeyance in part.  It is specifically recommended that Defendant Officers' motion be granted with respect to Plaintiff's Fourth Amendment False Arrest/Malicious Prosecution Claims and denied with respect to Plaintiff's First Amendment Retaliation and Fourteenth Amendment Equal Protection claims and held in abeyance with respect to whether Plaintiff's First Amendment right against retaliation was clearly established at the time of her arrest in 2017 and referred back to the undersigned to schedule supplemental briefing.

Therefore, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), Federal Rule of Civil Procedure

---

[4]     *See e.g.*, *Reichle v. Howards*, 566 U.S. 658, 664–65, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) ("This Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause; nor was such a right otherwise clearly established at the time of [Plaintiff's] arrest."); *Nieves*, 139 S. Ct. at 1727 (exception to no-probable cause requirement decided in 2019).

72, and the Local Rules for Magistrates, the parties have until **March 14, 2022** to file objections to this report and recommendation.  Unless otherwise ordered by the District Judge, responses to objections are due fourteen days after the service of the objections.  Failure to file timely objections will constitute a waiver of any appellate rights. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7  (3d Cir. 2011)

Dated: February 28, 2022.

Respectfully submitted,
s/ Cynthia Reed Eddy
Cynthia Reed Eddy
Chief United States Magistrate Judge

cc:     Honorable David S. Cercone
        Senior United States District Judge
        *via electronic filing*

        *Attorneys of record via electronic filing*

21